IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | § § | Case No 10-47840-705 |
| Thomas Vincent Beck, | § § | Chapter 7 |
| Debtor. | § § | |
| J and J Homebuilders, Inc., | § § | |
| Plaintiff, | § § | Adv. Proc. No. 10-4418-705 |
| v. | § § | |
| Thomas Vincent Beck, | § § | [Related to Docket No. 23] |
| Defendant. | § § | |

## MEMORANDUM OPINION

On September 24, 2010, the Plaintiff filed its "Complaint Objecting to Discharge" [Docket No. 1], thereby commencing this Adversary Proceeding. On March 9, 2011, in response to the Court's direction for a more definite statement, the Plaintiff filed another document captioned "Complaint Objecting to Discharge" [Docket No. 23] (along with later amendments by interlineation allowed with leave by Court order [Docket No. 79], the "Amended Complaint"). The Amended Complaint brought a claim for determination of exception to discharge pursuant to § 523(a)(2)(B) of the United States Code (the "Bankruptcy Code").[1] On September 5, 2012, the matter went to trial. The Court now enters this Memorandum Opinion in support of judgment in favor of the Defendant.

---

[1] Hereinafter, any reference to "§" or "§[§]" refers to the indicated section(s) of the Bankruptcy Code, unless otherwise indicated.

1

## I. FACTS

The Plaintiff is a Missouri construction company owned and operated by members of the Courtney family. The Defendant is an investor and mortgage broker. Until the events described herein, the Courtneys and the Defendant were long-time friends.

In 2004, The Building Lab LLC,[2] a company of which the Defendant was a member, took out an almost half-million dollar loan from Frontenac Bank with a maturity date of February 5, 2006. The loan financed a project (the "Project") to rehabilitate two St. Louis duplex homes and convert them into four single-family condominium units (the "Properties"[3]). The loan was guaranteed by the Defendant. In early 2006, as the maturity date approached, the Project had not been completed and the Properties had not been sold, and The Building Lab LLC needed additional financing. At the Defendant's request, the Courtneys agreed to draw on the Plaintiff's line of credit with Regions Bank to provide the financing needed to complete the Project. Accordingly, sometime between June 30, 2006 and July 10, 2006,[4] a Construction and Financing Agreement for Custom Home

---

[2] The Contract (as defined herein) names "The Building Lab, LLC" as one of the two contracting parties. However, pleadings filed in this Adversary Proceeding, pleadings filed in state court, and the Promissory Note with Frontenac Bank, all refer to "The Building Laboratory, LLC." For convenience, the Court uses the name "The Building Lab LLC."

[3] There were two multi-family properties in the Project: the duplex at 3410 Virginia Avenue and the duplex at 3226 Cherokee Street. The Project called for these duplexes to be split into four single-family condominiums, with each condominium assigned its own address: 3410 A Virginia Avenue, 3410 B Virginia Avenue, 3224 Cherokee Avenue, and 3226 Cherokee Avenue.

[4] The document gives two different dates.

2

(the "Contract") was executed, pursuant to which the Plaintiff agreed to provide $798,100 in financing to The Building Lab LLC. Of this amount, $512,246.91 was used to pay off the Frontenac Bank loan. The remainder was to be used to complete the Project.

The Project was unsuccessful and the Properties sold in 2012 for less than $200,000.00. In the aftermath, the Plaintiff filed a petition (the "State Petition") in St. Louis County Court against The Building Lab LLC (by then, known as Cherokee Villas LLC ("Cherokee Villas")) and four individuals, including the Defendant, who had guaranteed The Building Lab LLC's performance under the Contract (collectively, the "State Defendants"). The State Petition alleged breach of contract and other claims, but did not bring a claim for fraud. On August 14, 2009, the Plaintiff obtained a judgment of joint and several liability against the State Defendants in the amount of $717,248.00 plus court costs (the "State Judgment").

On November 10, 2009, the Defendant filed a petition for chapter 7 bankruptcy relief, thereby commencing the bankruptcy case (the "Main Case") in which this Adversary Proceeding is pending. Schedule F of the Schedules of Assets and Liabilities filed in the Main Case lists the Plaintiff as a creditor with an unsecured debt in the amount of the State Judgment (the "Debt").

The Plaintiff now seeks a determination that the Debt be excepted from discharge pursuant to § 523(a)(2)(B). It accuses the Defendant of luring it into incurring the Debt with false representations and by exploiting his friendship with the Courtneys. However, most of the false representations alleged in the

3

Amended Complaint are oral statements. An oral statement, even if false, cannot support a claim under § 523(a)(2)(B), which requires that the representation be in writing.[5] At trial, the Plaintiff offered two types of written statements in support of its claim: (1) four appraisals (one for each of the planned condominium units) (collectively, the "Appraisals")(Exh. L-O); and (2) a mortgage loan commitment letter (the "MLC"[6])(Exh. MM).[7]

## II.  ANALYSIS

Section 523(a)(2)(B) provides that a discharge under § 727 does not discharge a debtor from any debt for money to the extent obtained by "(B) use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive." 11 U.S.C. § 523(a)(2)(B). Exceptions to

---

[5] By contrast, § 523(a)(2)(A) provides for an exception to discharge based on a false oral statement. However, the Plaintiff did not bring a § 523(a)(2)(A) claim. The Amended Complaint (filed by prior counsel after being ordered by the Court to make a more definite statement and specifically plead the statutory basis for its claims) dropped all references to § 523(a)(2)(A) that had been included in the original complaint, and cited only § 523(a)(2)(B). However, despite this clear choice of a statutory basis, the Plaintiff nevertheless alleged in the Amended Complaint false oral statements, appearing not to recognize the irrelevancy of false oral statements to a § 523(a)(2)(B) claim. Later, new counsel argued that a claim under § 523(a)(2)(A) had been brought, despite the language of the Amended Complaint. Prior to trial, the Court rejected this argument and determined that a § 523(a)(2)(A) claim had not been brought.

[6] The parties also refer to the MLC as the "Permanent Take-Out Commitment."

[7] The Defendant complained at trial that the Plaintiff never pleaded for relief, in any version of the complaints, a claim based on the MLC. Regardless, however, even if the MLC was properly admitted, it does not establish a § 523(a)(2)(B) claim, as discussed herein.

4

discharge are narrowly construed against the creditor and liberally against the debtor, to effectuate the "fresh start" of the Bankruptcy Code. *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 883 (Bankr. N.D. Iowa 2002).

### A. The Appraisals

The Plaintiff was provided the Appraisals prior to the execution of the Contract. One of the Appraisals is dated as of December 27, 2005. The three remaining Appraisals are dated as of May 16, 2006. The December 2005 Appraisal lists Michael Kennedy as the borrower, and the remaining three Appraisals list Richard Coffin (a member of The Building Laboratory LLC and co-guarantor who became a State Defendant) as the borrower. Each of the Appraisals lists Clarion Mortgage Capital as the entity for whom the document was prepared and Rokas Varanavicius (another member, and the manager of, The Building Laboratory LLC, and a co-guarantor who became State Defendant) as the contact individual at Clarion Mortgage Capital.[8] The Appraisals forecast that the combined value of the Properties would exceed $1 million, assuming that the rehabilitation was completed and re-zoning was accomplished.

***"Respecting the debtor's or an insider's financial condition."*** The Appraisals are not statements regarding any entity's financial condition. The Appraisals projected in late 2005 and mid-2006 what the Properties might be worth, if sold, assuming that the rehabilitation, rezoning, and other circumstances were accomplished. They are hypothetical future values. They do not give a

---

[8] It is not clear what role Clarion Mortgage Capital played.

5

picture of the Properties' current value or offer insight on any entity's overall financial health as of the date of the Appraisals.

Moreover, even if the Appraisals could be found to be statements about an entity's financial condition, they are not statements about the debtor's or an insider's financial condition. The Appraisals are not statements respecting the debtor's (the Defendant's) financial condition, as they involve assets of The Building Lab LLC,[9] not personal assets of the Defendant. And the Appraisals are not statements respecting the financial condition of an insider, because the only alleged insider, The Building Lab LLC, is not actually an insider of the Defendant. The Building Lab LLC does not satisfy any statutory examples of an "insider." 11 U.S.C. § 101(31)(A). It also does not meet the definition of an "insider" articulated in *Fee v. Eccles (In re Eccles)*, 393 B.R. 845, 855 (Bankr. E.D. Mo. 2008). The Defendant was a member of The Building Lab LLC. However, he was not the manager or managing member.[10] He did not control the day-to-day operations. In fact, there is evidence that others managed the company. And there is no evidence that the Defendant and The Building Lab LLC did not deal with each other at arm's length.

The suggestion in the Plaintiff's argument is that the personal friendship between the Defendant and the Courtneys created a relationship that made The Building Lab LLC an insider of the Defendant. While the Defendant may have

---

[9] For purposes here, the reference to "The Building Lab LLC" also includes The Building Lab LLC's successor, Cherokee Villas.

[10] The documentary evidence indicates that Mr. Varanavicius was the "manager" in 2006 and Timothy M. Schlesinger was the "managing member" in 2004.

6

been the contact person at The Building Lab LLC who brought the Plaintiff into the financing deal, that does not mean that the Defendant was in control of the business, such that The Building Lab LLC is an insider of the Defendant.

***"False."*** Falseness is determined as of the time the statement is made, under the circumstances known and the assumptions accepted at the time. There is no evidence that—at the time the Appraisals were rendered, under the circumstances known and assumptions stated—the Appraisals were false. The Appraisals were produced by an independent appraiser whose disinterestedness and credibility were not challenged. There is no evidence that anyone manipulated or influenced the Appraisals by providing false information upon which the Appraisals were based. The fact that the projections of future value ultimately proved to be wrong, or the fact that the projections were founded on (what were later shown to be) poor assumptions, does not make the Appraisals false at the time they were rendered.

***"That the debtor caused to be made or published with the intent to deceive."*** Even if the Appraisals could be determined to be false statements, it was not shown that the Defendant caused the Appraisals to be made or published with the intent to deceive. First, the testimonial and documentary evidence shows that Mr. Varanavicius, not the Defendant, provided the Appraisals to the Plaintiff. Second, even if it could be found that the Defendant's participation constituted "causing the making or publishing" of the Appraisals, the evidence does not establish that the Defendant knew that the Appraisals were

7

false. Without such knowledge, the Defendant could not have had the intent to deceive.

The Court notes that the part of the Plaintiff's case relying on the Appraisals is so weak that even the Plaintiff treats it perfunctorily in its Post-Trial Brief. The Plaintiff's substantive post-trial argument focuses almost exclusively on the MLC.

### B.     The MLC

The MLC is a one-page document dated May 31, 2006, purporting to be an offer by the Essex Mortgage Company ("Essex") to extend an $824,000.00 loan mortgage commitment. The applicants listed on the MLC are the Defendant and three other individuals, all members of The Building Lab LLC. The document bears only one signature, reading "Peter Wright," the owner of Essex and a business partner of the Defendant.

***A statement "respecting the debtor's or an insider's financial condition."*** While a document need not be a traditional financial statement to qualify as a statement regarding the debtor's financial condition, *First Internat'l Bank v. Kerbaugh (In re Kerbaugh)*, 162 B.R. 255, 262 (Bankr. D.N.D. 1993), it must reveal something about the debtor's financial condition. For example, in *In re Kerbaugh*, the court determined that the credit application at issue was a statement regarding the debtor's financial condition because it had been held out by the debtors to be something on which the creditor should rely and it permitted a realistic assessment of the debtors' credit worthiness and financial capacity by disclosure of income and indebtedness. *Id.* at 262.

8

The MLC is a single-page, barebones document. It sheds no light on the Defendant's creditworthiness (other than, perhaps, that under undisclosed terms and unknown conditions, an offer to make a loan commitment was made to the Defendant, along with three other people—a vague light of little illumination). It discloses nothing about the Defendant's income or indebtedness, and offers no insight into any aspect of the Defendant's current financial condition. The MLC does not permit a realistic, meaningful assessment of the Defendant's creditworthiness or financial capacity. It is not a statement respecting the financial condition of the Defendant.[11]

The MLC also is not a statement respecting the financial condition of an insider—even if The Building Lab LLC could be determined to be an insider.[12] The MLC purports to offer a loan commitment to four applicants: the Defendant and three other individuals. It does not purport to offer a loan commitment to The Building Lab LLC. The Building Lab LLC is a wholly distinct, separate legal entity from its members. Nothing in the MLC suggests that any of the four applicants applied for a loan commitment on behalf of or as an agent for The Building Lab LLC. The MLC makes no representations—financial or otherwise—about The Building Lab LLC. Therefore, the MLC makes no statement of any nature— regarding the financial condition or otherwise—respecting The Building Lab LLC.

---

[11] Again, even the Plaintiff does not suggest that the MLC was used to assess the Defendant's creditworthiness or financial capacity. It alleges the MLC was used determine that the loan commitment requirement imposed upon The Building Lab LLC by Paragraph II.G was satisfied.

[12] This is a hypothetical. Building Lab LLC was not an insider. *See* Part II.A.

9

***"Materially false."*** The deposition testimony of Mr. Wright shows that Essex does not generally make the type of loan commitments described in the MLC, and that it did not make the specific loan commitment represented in the MLC. When asked at trial to explain how Mr. Wright's signature ended up on the MLC, the Defendant suggested that he had authority to sign the MLC on behalf of Mr. Wright. The Court is not persuaded that the MLC signed with such authority or with Mr. Wright's consent. However, even if the MLC constitutes a false statement because it represents without authority that Essex offered a loan commitment to the applicants, this fact alone does not establish a § 523(a)(2)(B) claim. Merely being "false" is not sufficient; the statement must have been "materially false."[13]

The determination of whether a statement is "materially false" involves objective and subjective components. The objective component requires that the statement paint "a substantially untruthful picture of a financial condition [of the debtor or an insider of the debtor] by a misrepresentation of the type which would normally affect the decision to grant credit." *Meyer v. Dygert (In re Dygert)*, 2000 WL 630833, *8 (Bankr. D. Minn. May 11, 2000). The subjective component considers whether the creditor would have extended credit if it had been apprised of the debtor's true situation. *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. at 885 (Bankr. N.D. Iowa 2002)(citing *First Internat'l Bank v. Kerbaugh (In re Kerbaugh)*, 162 B.R. at 262)).

---

[13] "Materially false" cannot mean simply "false." The Court assumes that Congress did not intend any word to be superfluous and interprets the statute to give meaning to every word, including "materially."

10

As to the objective component, even if the MLC could be determined to paint a substantially untruthful picture of the financial condition of the Defendant, it did not involve a misrepresentation of the type which would normally affect the decision to grant credit. The MLC's misrepresentation was that the Defendant had obtained a loan commitment. This misrepresentation is not of the type which would normally affect the decision to grant credit because it is irrelevant to the determination the Plaintiff claims it relied on the MLC to make: determining that the loan commitment requirement of Paragraph II.G had been satisfied.[14]

Paragraph II.G provides that "Purchaser shall furnish . . . a firm commitment to provide financing to Purchaser for complete payment of the purchase price," where "Purchaser" is defined as "The Building Lab LLC." However, as noted previously, the MLC states that the loan commitment offer was extended to the Defendant and three other individuals, not to The Building Lab LLC. These four individuals are the only applicants on the MLC, and they are listed only in their individual capacities. There is no reference in the MLC to The Building Lab LLC, and there is no suggestion that any applicant applied for the loan commitment on behalf of The Building Lab LLC or was acting to bind The Building Lab LLC.[15] As such, the MLC's representation that the Defendant and the three other individuals received a loan commitment is irrelevant to the issue

---

[14] The Plaintiff does not suggest that the MLC affected its decision to extend credit, other than by serving as the purported basis for believing that the loan commitment requirement of Paragraph II.G had been satisfied.

[15] The MLC—or, at least, the version of the MLC admitted into evidence—was not countersigned by the applicants. The applicants' signature lines are blank.

11

of whether Paragraph II.G was satisfied. Irrelevant representations—whether true or false—should not affect a decision to extend credit, especially if the creditor is a sophisticated business entity. Only relevant representations should affect a decision to extend credit.

As to the subjective component, the inquiry is whether the Plaintiff would have extended credit if it had been apprised of the Defendant's true financial situation (that is, if it had been apprised that no loan commitment had been offered to the Defendant). Being apprised that the Defendant had not been offered a loan commitment should have made no difference to the Plaintiff's decision to extend credit—just as being (falsely) apprised that the Defendant had been offered a loan commitment should have made no difference to the decision to extend credit. Whether the Defendant did, or did not, obtain a loan commitment had nothing to do with determining whether Paragraph II.G was satisfied. A creditor cannot rely on an irrelevant false representation to determine whether to extend credit, then shield the resulting debt from discharge on the intellectually disingenuous argument that credit would not have been extended, if only the creditor had been apprised of the true circumstances about the irrelevant representation.

***"Reasonably relied."*** A threshold element of reasonable reliance is actual reliance. *Carson v. Chamberlain (In re Chamberlain)*, 330 B.R. 195, 204 (Bankr. S.D. Ohio 2005). Actual reliance did not occur here. There is no persuasive evidence that anyone at the Plaintiff actually read the MLC prior to

12

determining that Paragraph II.G had been satisfied.[16]  Even a cursory reading of the MLC reveals that it does not make any representation regarding whether The Building Lab LLC obtained a loan commitment.  It is axiomatic that one cannot actually rely on a document it has not read, and it is equally axiomatic that one cannot reasonably rely on a document on which it does not actually rely.  Therefore, the Plaintiff could not have reasonably relied on the MLC in incurring the Debt.

It is not surprising that the Plaintiff did not actually read the MLC.  A similar willingness to do business with The Building Lab LLC without conducting basic due diligence was demonstrated when the Plaintiff entered into the Contract. The Contract is inconsistently drafted and sloppily executed. As noted previously, the Contract names "The Building Lab, LLC" as a party to the Contract, even though this appears not to have been the entity's proper legal name. The Contract defines "The Building Lab, LLC" as the "Purchaser(s)," but then refers at times to "Purchaser," at other times to "Purchasers," and then at other times to "Purchaser(s)."  This confusion about (or indifference to) critical terms of the Contract is further shown in the execution block.  The Contract is signed by four individuals (members of The Building Lab LLC), but each in his individual capacity only. No signature block for The Building Lab LLC is even provided.  No

---

[16] This assumes that the Plaintiff received the MLC prior to performing under the Contract and incurring the Debt.  The evidence raises questions as to this timing.  If the Plaintiff did not receive the MLC until after performing under the Contract and incurring the Debt (regardless of whether the Plaintiff "required" a loan commitment before performing), then there could not have been either the actual use of the MLC in the incurrence of the Debt or reasonable reliance on the MLC by the Plaintiff.

13

one acting in a capacity as a representative of The Building Lab LLC signed the Contract.  (This is in contrast to the Plaintiff's signature on the Contract, where Bill Courtney signed not in his individual capacity, but specifically as President of the Plaintiff.)  Given this level of inattentiveness to the fundamental terms of the Contract and a willingness to simply fill-in-the-blanks on a canned form contract, the Plaintiff's failure to read the MLC was predictable.  The entire deal demonstrates a casual, imprecise effort.  The Plaintiff's pattern of forgoing basic due diligence and instead relying on the Courtneys' relationship with the Defendant appears to have been extended to the MLC, which the Plaintiff did not read to confirm that Paragraph II.G was satisfied.

In the alternative, even if the Plaintiff read and actually relied on the MLC to conclude that Paragraph II.G was satisfied, it was not reasonable for the Plaintiff to rely on the MLC for the purpose that the Plaintiff claims it did.  The MLC does not make any representation relevant to Paragraph II.G. The conclusion that Paragraph II.G had been satisfied could not have been reached by relying on any representation in the MLC.  As such, relying on the MLC to conclude that Paragraph II.G had been satisfied was not reasonable.

## IV.  CONCLUSION

Accordingly, the Court **FINDS** that the evidence did not establish the elements of § 523(a)(2)(B), and **HOLDS** that it is proper to enter judgment on the § 523(a)(2)(B) claim in favor of the Defendant.  A separate order of judgment consistent with the findings and holdings made herein shall be entered forthwith.

DATED:  January 14, 2013  
St. Louis, Missouri 63102  
mtc

CHARLES E. RENDLEN  
U.S. Bankruptcy Judge

Copy Mailed To:

**Laura Toledo**
Lathrop & Gage LLP
7701 Forsyth Blvd., Suite 400
Clayton, MO 63105

**Robert E. Eggmann**
Desai Eggmann Mason LLC
7733 Forsyth Boulevard, Suite 2075
Clayton, MO 63105

**Charles W. Riske**
Attorney at Law
231 S. Bemiston, Suite 1220
St. Louis, MO 63105

**Clyde C Farris**
Copeland Thompson Farris, PC
231 S. Bemiston
Suite 1220
Clayton, MO 63105